PEOPLE v. COLEMAN.

1. OBSTRUCTING JUSTICE—ATTEMPTS.

The crime of attempting to obstruct justice is committed when the effort is made to thwart or impede the administration of justice irrespective of the success of the attempt.

2. CRIMINAL LAW—INTENT—PREPARATION—ATTEMPT.

Mere intention and preparation alone are not sufficient to constitute an attempt to commit a crime, it being necessary to an attempt that there be some appreciable fragment of the crime committed, that there be such progress that it will be committed unless interrupted by circumstances independent of the will of the attempter.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 14 Am Jur, Criminal Law § 65.
[2] 14 Am Jur, Criminal Law § 67.
[3] 14 Am Jur, Criminal Law § 68.
[4, 5] 39 Am Jur, Obstructing Justice § 6.

3. SAME—ATTEMPT—DESIGN—EVIDENCE.

Acts done, slight but unequivocal, in furtherance of a clearly shown design to commit a crime will constitute an attempt to commit the crime.

4. OBSTRUCTING JUSTICE—ATTEMPT—EVIDENCE—THREAT OF EXPOSURE OF WITNESS.

Defendant who was charged with a violation of the small loan act and who procured an intermediary to tell a prospective witness to the crime charged that the wife of such witness would not learn of his infidelity to her if he failed to testify and furnished the intermediary with a memorandum as to names and addresses of parties involved was properly found guilty of an attempt to obstruct justice.

5. SAME—ATTEMPT—OVERT ACTS—ORAL THREAT.

An attempt to dissuade a witness from testifying may be accomplished by the use of words as well as by physical violence, hence, the use of words for such purpose may constitute an overt act going directly toward the consummation of the crime of an attempt to obstruct justice.

6. SAME—ATTEMPT.

An attempt to obstruct justice is no less reprehensible, criminal or punishable merely because it is unsuccessful.

7. SAME—ATTEMPT—DELIVERY OF THREAT TO PROSPECTIVE WITNESS.

The fact that defendant's intermediary in his attempt to dissuade a witness from testifying against him in a prosecution for violation of the small loan act fell into the hands of police officers and performed the acts requested by defendant in the immediate presence of the officers was immaterial, since the manner of delivery of the threat to the prospective witness was a matter beyond defendant's control after the intermediary had started the course of action set by defendant.

8. SAME—CHARGE TO JURY.

Charge given to jury in prosecution for attempt to obstruct justice, when considered as a whole, *held*, without reversible error.

Appeal from Muskegon; Pugsley (Earl C.), J., presiding. Submitted June 13, 1957. (Docket No. 67, Calendar No. 47,069.) Decided November 26, 1957.

William I. Coleman was convicted of attempting to obstruct justice. Affirmed.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Robert A. Cavanaugh,* Prosecuting Attorney, for the people.

*Poppen, Street & Sorensen* (*Harold M. Street,* of counsel), for defendant.

Smith, J. This case involves an alleged attempt to obstruct justice. The facts are simple. The defendant, William Coleman, had been charged with a violation of the small loan act, CL 1948, § 493.1 (Stat Ann 1957 Rev § 23.667), and his trial date set. One William Jordan had been subpoenaed as a witness for the people. Jordan was married, but his wife was ignorant of the fact that he had been "running around" (the expression is his) with a young woman. The ignorance of the wife, however, was not shared by defendant Coleman. Apparently Coleman was, as the saying goes, nobody's fool, for the fact that a prospective witness against him had been "running around" invested the witness, in Coleman's opinion, with a peculiar vulnerability. This he had both the wit to appreciate and the ingenuity to utilize.

On the evening of September 15, 1955, one Charles Goldsborough came to defendant Coleman to make a payment. After some conversation irrelevant hereto Coleman asked his caller whether or not he knew Jordan. We continue in Goldsborough's words:

"I imagine I told him I had seen him around, but I mean I didn't know him. I didn't know him good.

"And then he asked me if I would go around and talk to him, and I said, 'I don't know, I will go around and see him.' And then he told me what, actually what he wanted me to see him about, that he was—

had the knowledge that this Mr. Jordan had run around with some Jefferson girl that lived on Cedar street, that Mr. Coleman was aware that he run around with this woman, and that if I would talk to Mr. Jordan and ask him if he didn't show up at the trial his wife wouln't find out that she was running with him.

"*Q.* That she was running around with who?

"*A.* That this Jefferson girl was running around with Mr. Jordan.

"*Q.* And what did you say, if anything, to that?

"*A.* Well, then he said there was 2 or 3 other witnesses that had something to do with this case. And so I said, 'Well, write the names down. I don't know them.' And he wrote their names down for me on a slip of paper, and the address of Mr. Jordan. I think the addresses of the other ones, too.

"I have seen people's exhibit 1 before. I saw it at 1452 Sanford street upstairs on the back porch. I got it from Mr. Coleman. He wrote them addresses on that paper for me.     *     *     *

"*Q.* What appears on the face of that document?

"*A.* William H. Jordan, 2421 B Elwood street. That is in the Heights. And Richard Jordan and Terry Ford at 2425 Manz street. And then there's Thomas J.—it looks like Fisher, but it's supposed to be Fikes.

"On the reverse side it says the Jefferson girl at corner of Walton and Cedar street. Those names and addresses were written there by Mr. Coleman. This was after supper in the evening. It was not dark when I left Coleman's, it was just the latter part of the evening. It hadn't been dark when I left the porch."

Goldsborough started on his errand. Difficulties in locating Jordan, however, ensued. The numbers on Elwood street had been changed. Goldsborough made inquiries at the Rainbow Cafe but no satisfactory answer was obtained. He then proceeded in his

car "up to the Heights" and decided to consult a telephone directory.

We will interrupt the chronological statement to make some inquiries at this point. Why was Goldsborough thus driving the streets searching for witness Jordan? Was he seeking to pay a social call on this man he did not know? Or was he carrying Coleman's threat, calculated to persuade Jordan from testifying? If the latter, were steps then and there being taken under Coleman's directions (*i.e.,* was Coleman attempting, by means of an agent) to aid in the administration of justice? Or to obstruct it? Are these steps consistent with any purpose other than evil? Goldsborough continues.

"I went to the desk at the Muskegon Heights police department and just asked for the phone book. I laid the piece of paper—they have a little glass shelf there, I put it on there, and Mr.—and Detective Sovacool was looking at the numbers. And then he asked me what I was doing with it. And I said, 'I have to look up this—' * * *

"Mr. Sovacool said that he had been over to see them same addresses that same day. And I just told him I was looking to see if he had a phone to find his address. And finally he called me in the office, in the back office, and he said—he started telling me about he served subpoenas on them, and finally he got out of me, or I told him what I was going over there for."

With this knowledge of what was afoot, Detective Sovacool called the prosecuting attorney and the chief of police. We continue in the words of the witness, omitting reference to objection overruled:

"So, anyway, Mr. Sovacool said, 'Well, I am going to call Mr. Cavanaugh.' And he called Mr. Cavanaugh, and Mr. Cavanaugh asked to talk to me on the phone. And he asked me what it was about, and I told him.

"And then Mr. Bell was called, and he came up there, and then I was told to go over there and perform the service. And Mr. Sovacool was along when I went over to Mr. Jordan's house. I had my own automobile. I had driven down to Coleman's in my car. Nobody was with me. I drove from Coleman's out to the Rainbow. I drove from the Rainbow over to the police station.

"*Q.* Did you drive your vehicle, then, back to Jordan's place?

"*A.* I did.

"Sovacool was in the back seat of the car. There was no one else besides me and Sovacool in the car. We went to Jordan's place.

"I went to the front door, and I hollered if Mr. Willie Jordan was there. And some woman hollered 'Yes.' And he came to the door, and I asked him if I could talk to him. And he said, 'Yes', And I said, 'Could I talk to you out by the car?' And he said, 'Sure.'

"And he was about 3 feet from the car, and I would say, and the back window was rolled down, and I told Mr. Jordan—(Objection omitted).

"I related to Mr. Jordan just what Mr. Coleman advised me to do in regards to him showing up at his trial, in regards to Mr. Jordan running around with this Jefferson girl.

"*Q.* You say you told him what Coleman told you. What did you tell him?

"*A.* I told him that Mr. Coleman asked me to come over and talk to him. And I asked him if he knew a Jefferson girl, and he said, 'Yes.' And so I told him my name, and I told him I didn't know him and he didn't know me, and that if he was not to show up at the trial he would not get in any trouble with his wife.

"So Mr. Jordan said well, he would show up at the trial, anyway, regardless of the fact. Then he said he would tell his wife about that, about this girl. And I said, 'All right.' And I got in the car and drove away."

(Notwithstanding the threat made, Jordan did appear at the trial and testified against Coleman.) Returning to the case before us; it proceeded to trial in due course before a jury in the circuit court. Verdict of guilty was returned by the jury and the case is here upon leave granted.

The defendant urges upon us that up to the time Goldsborough entered the police station none of the acts recited constituted an attempt by Coleman to obstruct justice, but only preparations for such an attempt. And, further, that to constitute such an attempt "required actual contact with Jordan and a transmission of the message to him in a manner calculated to actually deter him from testifying."

It must be borne in mind that the offense with which defendant is charged is obstruction of justice by "attempting" to dissuade (by threats and coercion) a witness from testifying. The offense is not peculiar to our modern society (See *Regina* v. *Loughran* [Ir 1839], 1 Craw & Dix 79: " 'It would be better for you to bring your sheet and coffin, than to prosecute my brother Paddy.' "; *Rex* v. *Lawley* [1731], 2 Strange 904 [93 Eng Rep 930]) and its applicable principles are well settled. The crime is committed when the effort is made to thwart or impede the administration of justice. The evil lies in attempt as well as its success. As we said in *People* v. *Boyd,* 174 Mich 321, 325, 326 (prosecution for obstructing the administration of justice):

"The question in the instant case is not the guilt or innocence of the respondent in the main case, nor the sufficiency of the information or the jurisdiction of the court, but whether the respondent is guilty of obstructing or interfering with the administration of justice. In an examination of the authorities we find none in conflict with the authority above cited. In one of the earliest authorities, where the exact

question was before the supreme court of the State of Vermont (in 1847), that court said:

" 'Much of the argument at the bar has been expended upon supposed irregularities in the original proceedings against Goodale & Poor, and insufficiencies in the indictment against them prepared and laid before the grand jury. That indictment is not recited, and need not be in the present; it is not, consequently, before us. In offenses of this kind guilt or innocence does not depend upon the guilt or innocence of the original party, against whom the witness may be subpoenaed, or recognized, to appear; nor upon the sufficiency or insufficiency of the original indictment. To thwart or obstruct the due administration of justice by violence, bribery, threats, or other unlawful means, whether in preventing the attendance of witnesses, jurymen, or other officers of court, is a highhanded offense, which strikes at the vitals of judicial proceedings, and subjects to severe animadversion in every well-ordered community. The attempt to commit such an act, it is well settled, is itself a substantive offense, punishable by the common law.

" 'In this instance, the attempt was unsuccessful; the witness, Warren, attended court and testified before the grand jury, as he had bound himself by recognizance to do. Moreover, the parties against whom he appeared must be taken to have been innocent of the crime imputed to them; and, in addition to this, the indictment against them, if in the description of the offense it followed the complaint filed [preferred*] before the magistrate, I am inclined to think was fatally defective. Still, all these circumstances are entirely consistent with the respondent's guilt. Since the case of *State* v. *Keyes* (1836), 8 Vt 57 (30 Am Dec 450), it is quite unnecessary to pursue this subject at any length.' *State* v. *Carpenter,* 20 Vt 9, 12.

---

* The Vermont opinion uses the term "preferred" rather than "filed" at this place.

"See, also, 3 Bishop's New Criminal Procedure (2d ed), § 897; 2 Wharton's Criminal Law (11th ed), § 1597. See, also, *State* v. *Holt,* 84 Me 509 (24 A 951); *Commonwealth* v. *Berry,* 141 Ky 477 (133 SW 212, 33 LRA NS 976, Ann Cas 1912C, 516), and notes."

But just as the crime charged does not require acts beyond an attempt, it is equally true that an attempt must in fact be made, *i.e.,* that whatever is done go beyond acts merely of preparation. As to the difference between "mere" acts of preparation and those amounting to attempts, "The Law," as Holmes well said (The Common Law, p 68), "does not punish every act which is done with the intent to bring about a crime." The purchase of a fountain pen intended for forgery would doubtless be deemed merely an act of preparation. Likewise, even the purchase of a hunting rifle, secretly intended for the murder of the neighbor, though equally useful for the hunting of deer. Not so, however, the placing of a bomb so connected that it would explode when the occupant of the house turned on his radio. *Commonwealth* v. *Kocher,* 162 Pa Super 605 (60 A2d 385). An important difference between the acts is this: In the former cases, the acts of the defendant have never gone beyond acts of an ambiguous nature. The purchase of the hunting rifle or fountain pen (without more) is as consistent with good as with evil. Not so the placing of the bomb, although in each case the ultimate result is not yet accomplished. The supreme court of California held thus on the point before us (*People* v. *Miller,* 2 Cal2d 527, 530–532 [42 P2d 308, 98 ALR 913]):

"Mere intention to commit a specified crime does not amount to an attempt. (*People* v. *Stiles,* 75 Cal 570 [17 P 693].) Preparation alone is not sufficient. 'Something more is required than mere menaces, preparation or planning.' (30 CJ, p 13.) 'The

preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the *direct movement* towards the commission after the preparations are made. * * * Therefore, the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation.' (8 RCL, pp 278, 279.) 'There must be at least some appreciable fragment of the crime committed, and it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter.' (1 Wharton's Criminal Law [12th ed], p 280.) * * *

"We are mindful of the fact that language appearing in *Stokes* v. *State,* 92 Miss 415, 428 (46 So 627, 21 LRA NS 898), that 'whenever the design of a person to commit crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt,' has received approval. (*People* v. *Lanzit,* 70 Cal App 498, 507, 508 [233 P 816]; 8 RCL, p 279; 13 RCL, p 798.) The statement, however, that slight acts in *furtherance of the design* will be sufficient is not in conflict with the usual statements of the tests applied to aid in drawing the line at the point where preparation leaves off and execution has commenced. It still presupposes some direct act or movement in execution of the design, as distinguished from mere preparation which leaves the intended assailant only in the condition to commence the first direct act toward consummation of his design. The reason for requiring evidence of a direct act, however slight, toward consummation of the intended crime, is, as pointed out by the author in Wharton's Criminal Law, that in the majority of cases up to that time the conduct of the defendant, consisting merely of acts of preparation, has never ceased to be equivocal; and this is necessarily so, irrespective of his declared intent. It is that quality of being equivocal that must be lacking before the act becomes one which may be said to be a commencement of the commission of the crime, or an overt act, or before

any fragment of the crime itself has been committed, and this is so for the reason that so long as the equivocal quality remains no one can say with certainty what the intent of the defendant is. As stated in *United States* v. *Ford* (DC NC), 34 F 26, 27, 'the intention of the actor can alone be clearly ascertained by the movements which he had made to complete his design.' "

A thoughtful test for the resolution of the equivocal act has been phrased by Turner in his article, "Attempts to Commit Crimes" in 5 Cambridge LJ, 230, 237, 238, in these words:

"If the acts of the accused, taken by themselves, are unambiguous, and cannot, in reason, be regarded as pointing to any other end than the commission of the specific crime in question, then they constitute a sufficient *actus reus*. In other words, his acts must be *unequivocally referable* to the commission of the specific crime. They must, as the late Sir John Salmond said, 'speak for themselves.' If the example may be permitted, it is as though a cinematograph film, which had so far depicted merely the accused person's acts without stating what was his intention, had been suddenly stopped, and the audience were asked to say to what end those acts were directed. If there is only one reasonable answer to this question then the accused has done what amounts to an 'attempt' to attain that end. If there is more than one reasonably possible answer, then the accused has not yet done enough."

Likewise, in *People* v. *Youngs*, 122 Mich 292, 293 (47 LRA 108), we held as follows:

"To constitute an attempt, at the common law, something more than an intention or purpose to commit crime is necessary. As was said by Field, C.J., in *People* v. *Murray*, 14 Cal 159:

" 'Between preparation for the attempt and the attempt itself, there is a wide difference. The prep-

aration consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made.'

"In *Regina* v. *Taylor,* 1 Fost & Fin 511, 512, the chief baron said:

" 'The act, to constitute a criminal attempt, must be one immediately and directly tending to the execution of the principal crime, and committed by the prisoner under such circumstances that he has the power of carrying his intention into execution. If 2 persons were to agree to commit a felony, and 1 of them were, in execution of his share in the transaction, to purchase an instrument to be used in the course of the felonious act, that would be a sufficient overt act in an indictment for conspiracy, but not in an indictment of this nature.' "

Tested by the requirements hereinabove suggested the attempt of defendant Coleman to obstruct justice is clear. Whatever planning he had had to do, whatever scheme he had devised, the period of thought and reflection was over and the time for action in furtherance thereof had arrived. Goldsborough was sounded out. He proved acquiescent. He was then instructed to carry Coleman's threat and, in fact, was furnished with a written memorandum by Coleman in order that there be no slip or miscarriage through error in person or address. Is there anything equivocal in Coleman's acts hereinabove described? Is there any reasonable construction thereof save that they were directed towards the coercion of witness Jordan to refrain from testifying? If so, it has not been suggested to us and we cannot perceive it. Certainly when Coleman's agent, armed with the written memorandum, and charged with the threat and the means and the willingness to deliver it, left Coleman's presence the latter had made an attempt to impede justice and we need not speculate what acts short thereof or in addition thereto would

also have sufficed. Not only have we passed the planning stage but we have likewise passed the point of solicitation involved in *McDade* v. *People,* 29 Mich 49, relied upon by appellant.

The appellant likewise urges upon us that "the law does not punish evil intent unaccompanied by some overt act going directly toward the consummation of a crime." But what, here, is the crime? It is the attempt to dissuade, which may be accomplished by words as well as physical act of violence. That words themselves may be overt acts under some circumstances, in fact overt acts sufficient to constitute crimes, is well settled. See *People* v. *Ruthenberg,* 229 Mich 315; *State* v. *Terrill,* 87 Kan 745 (125 P 65). The Louisiana court (*Armstrong* v. *Vicksburg, Shreveport & Pacific R. Co.,* 46 La Ann 1448, 1463 [16 So 468]) put the law in these terms:

"It is a mistake, however, to suppose that in order to constitute force it is always necessary that actual active physical force be applied, or that to constitute 'threats' violent language be employed. Any conduct, in the connection we are now dealing with the word, which would place the officer executing the process of the court in bodily fear or terror is 'that force' contemplated by the law, while 'threats' may be communicated by signs or by actions as fully and thoroughly as by word of mouth."

As we pointed out in *People* v. *Boyd, supra* (see, also, 3 Gillespie, Michigan Criminal Law and Procedure [2d ed], § 1968), the substantive offense, punishable at common law, is the mere attempt to persuade a witness not to testify. The law does not require that the attempt be successful or even that it be such as would be the most promising. Attempts may vary in means or vigor, and success may well depend upon a host of factors, such as the violence with which the threat is delivered, or its accompaniment by force or show thereof. Witnesses, moreover, vary in

courage. A threat that would be brushed aside by one of the utmost resolution might well cause one of weaker will to hesitate or falter. Yet the court's search for truth cannot be restricted to the bold and courageous. It must comprehend all kinds and conditions of men. We do not weigh in delicate scales the force exerted or the terror inspired. Enough for us that an attempt is made. If successful, the court's function has been defeated by private aggression. If unsuccessful the orderly processes of society have been challenged, the intimidation of the citizen sought, and effort made to substitute the fear of violence or disgrace for the fairness of due process. The attempt itself is a criminal act. That it was not successful makes it no less reprehensible, no less criminal, no less punishable.

Under the view we have taken of the case it is not material to our decision whether Goldsborough spoke his piece to Jordan as an agent of Coleman or of the police (though the jury was fully instructed on this point) and, hence, those cases involving the conduct or motives of a feigned accomplice (*People* v. *Collins,* 53 Cal 185; *People* v. *McCord,* 76 Mich 200, 205, "one of the most disgraceful instances of criminal contrivance to induce a man to commit a crime in order to get him convicted that has ever been before us;" *State* v. *Neely,* 90 Mont 199 [300 P 561]), and situations similar in principle, are not in point. When Coleman set in motion forces over which he no longer retained control and which would have produced their intended result of deterrence of the witness save for the interposition of elements beyond the power of his will he had made his attempt. In deference to zeal of counsel we will point out that even had Coleman made no attempt prior to Goldsborough's delivery of the threat to Jordan, it would not be material whether the message was delivered in a menacing or a jesting manner, although there is

no evidence of the latter. An attempt can equally well (as far as the instigator's criminality is concerned) be made through the agency of an innocent child, a dolt or a maniac, or, indeed, the public mails (*e.g., People* v. *Botkin,* 132 Cal 231 [64 P 286, 84 Am St Rep 39], sending poisoned candy through the mails with the intention of killing the recipient). So far as the manner of delivery is concerned, the failure of an agent carrying a threat to deliver it in such a manner as properly to cow the recipient and bend him to the principal's will may be cause for reproach of the agent by his principal but we do not fret ourselves over this breach of trust.

Appellant also alleges error in the charge given. Under the law applicable and upon reading the charge as a whole, we are not persuaded that there was error therein. The charge given, in fact, went beyond that to which he was entitled, but he is in no position to complain thereof.

Affirmed.

DETHMERS, C. J., and SHARPE, EDWARDS, VOELKER, KELLY, CARR, and BLACK, JJ., concurred.