PEOPLE v KIMBALL

Docket No. 48798. Submitted December 3, 1980, at Grand Rapids.—
Decided September 9, 1981. Leave to appeal applied for.

James E. Kimball was charged with and convicted of attempted
unarmed robbery at a bench trial in Leelanau Circuit Court
and was sentenced, William R. Brown, J. Defendant appeals,
contending that the trial court erred in rejecting the legal basis
of his defense of voluntary abandonment. *Held:*

Voluntary abandonment of efforts to commit a crime at-
tempted under circumstances manifesting a complete and vol-
untary renunciation of criminal purpose, there being no outside
cause for such abandonment, is an affirmative defense to a
prosecution for criminal attempt. The trial court never deter-
mined whether defendant's abandonment was voluntary or
involuntary. Defendant's conviction is reversed and the cause is
remanded for a new trial at which defendant may present a
defense of voluntary abandonment.

Reversed and remanded.

J. T. KALLMAN, J., dissented. He would hold that the defen-
dant had progressed too far into the crime to assert the defense
of voluntary abandonment. He would affirm the conviction and
sentence.

OPINION OF THE COURT

1. CRIMINAL LAW — ATTEMPT.

The elements of a criminal attempt are (1) the specific intent to
commit the crime attempted and (2) an overt act going beyond
mere preparation towards the commission of the crime.

2. CRIMINAL LAW — ATTEMPT.

The fact that a defendant failed to carry through to completion a
crime attempted because of the intervention of outside forces,
because circumstances turned out to be different than expected

REFERENCES FOR POINTS IN HEADNOTES
[1] 21 Am Jur 2d, Criminal Law §§ 158-160.
[2-7] 21 Am Jur 2d, Criminal Law §§ 158-160, 183.

or because the defendant met more resistance than expected is no defense to a charge of criminal attempt.

3. CRIMINAL LAW — ATTEMPT — DEFENSES — VOLUNTARY ABANDON-MENT.

Voluntary abandonment of efforts to commit a crime attempted under circumstances manifesting a complete and voluntary renunciation of criminal purpose, there being no outside cause for such abandonment, is an affirmative defense to a prosecution for criminal attempt.

4. CRIMINAL LAW — ATTEMPT — DEFENSES — VOLUNTARY ABANDON-MENT — BURDEN OF PROOF.

The burden is on the defendant who asserts the affirmative defense of voluntary abandonment to a charge of criminal attempt to establish by a preponderance of the evidence that he or she has voluntarily and completely abandoned his or her criminal purpose.

5. CRIMINAL LAW — ATTEMPT — DEFENSES — ABANDONMENT.

Abandonment of efforts to commit a crime attempted is not voluntary where the defendant failed to complete the attempted crime because of unanticipated difficulties, unexpected resistance, or circumstances which increased the probability of detention or apprehension, nor is the abandonment voluntary where the defendant failed to consummate the attempted offense after deciding to postpone the criminal conduct until another time or to substitute another victim or another but similar objective.

6. CRIMINAL LAW — ATTEMPT — INVOLUNTARY ABANDONMENT.

Involuntary abandonment of efforts to commit a crime attempted is not a defense to a charge of criminal attempt.

DISSENT BY J. T. KALLMAN, J.

7. CRIMINAL LAW — ATTEMPT — DEFENSES — VOLUNTARY ABANDON-MENT.

*It is legally too late for a person, once he has failed in the perpetration of a crime for whatever reason, to assert the affirmative defense of voluntary abandonment of criminal intent to a charge of criminal attempt.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Larry J. Nelson,* Prosecuting Attorney, and *Mary C. Smith,* Assistant Attorney General, for the people.

*Thomas G. Power,* for defendant on appeal.

Before: R. B. BURNS, P.J., and R. M. MAHER and J. T. KALLMAN,* JJ.

R. M. MAHER, J. Defendant was charged with and convicted of attempted unarmed robbery, MCL 750.530; MSA 28.798, MCL 750.92; MSA 28.287, at a bench trial conducted in early August, 1979. He was sentenced to a prison term of from three to five years and appeals by leave granted.

There is really very little dispute as to what happened on May 21, 1979, at the Alpine Party Store near Suttons Bay, Michigan. Instead, the dispute at trial centered on whether what took place amounted to a criminal offense or merely a bad joke. It appears that on the day in question the defendant went to the home of a friend, Sandra Storey, where he proceeded to consume a large amount of vodka mixed with orange juice. Defendant was still suffering from insect stings acquired the previous day so he also took a pill called "Eskaleth 300", containing 300 milligrams of Lithium, which Storey had given him. After about an hour, the pair each mixed a half-gallon container of their favorite drinks (vodka and orange juice, in the defendant's case) and set off down the road in Storey's '74 MGB roadster.[1] At approximately 8:15 or 8:30 in the evening, defendant (who was driving) pulled into the parking lot of the Alpine Party Store. Although he apparently did not tell Storey why he pulled in, defendant testi-

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] After defendant was arrested samples were taken of his blood, urine, and stomach contents. An analytical forensic toxicologist employed by the state police testified that, based on the blood sample taken after defendant's arrest, defendant's blood alcohol level at the time of the events in the store would have been approximately .255 percent.

fied that the reason for the stop was to buy a pack of cigarettes.

Concerning events inside the store, testimony was presented by Susan Stanchfield, the clerk and sole employee present at the time. She testified that defendant came in and began talking to and whistling at the Doberman Pinscher guard dog on duty at the time. She gave him a "dirty look", because she didn't want him playing with the dog. Defendant then approached the cash register, where Stanchfield was stationed, and demanded money. Stanchfield testified that she thought the defendant was joking, and told him so, until he demanded money again in a "firmer tone".

> *"Stanchfield:* By his tone I knew he meant business; that he wanted the money.
> *"Prosecution:* You felt he was serious?
> *"Stanchfield:* I knew he was serious."

Stanchfield then began fumbling with the one dollar bills until defendant directed her to the "big bills". Stanchfield testified that as she was separating the checks from the twenty dollar bills defendant said "I won't do it to you; you're good-looking and I won't do it to you this time, but if you're here next time, it won't matter". A woman then came in (Storey) who put a hand on defendant's shoulder and another on his stomach and directed him out of the store. Stanchfield testified that she called after the defendant, saying that she would not call the police if he would "swear never to show your face around here again". To this defendant is alleged to have responded: "You could only get me on attempted anyway". Stanchfield then directed a customer to get the license plate number on defendant's car while she phoned the owner of the store.

Defendant also testified concerning events inside the store. He stated that the first thing he noticed when he walked in the door was the Doberman Pinscher. When he whistled the dog came to him and started licking his hand. Defendant testified that while he was petting the dog Stanchfield said "[w]atch out for the dog; he's trained to protect the premises".

"*Defendant:* Well, as soon as she told me that the dog was a watchdog and a guarddog *[sic]*, I just walked up in front of the cash register and said to Sue [Stanchfield]—I said, 'I want your money'.

* * *

"I was really loaded and it just seemed to me like—it was kind of a cliche because of the fact that they've got this big bad watchdog there that's supposed to watch the place and there I was just petting it, and it was kind of an open door to carry it a little further and say hey, I want all your money because this dog isn't going to protect you. It just kind of happened all at once.

* * *

"She said—I can't quote it, but something to the effect that if this is just a joke, it's a bad joke, and I said, 'Just give me your big bills'.

* * *

"Then she started fumbling in the drawer, and before she pulled any money out of the drawer—I don't know whether she went to the ones or the twenties—I said— as soon as she went toward the drawer to actually give me the money, I said, 'Hey, I'm just kidding'. and something to the effect that you're too good-looking to take your money.

* * *

"[A]nd she said, 'Well, if you leave right now and don't ever come back I won't call the police', and I said, 'Okay, okay', and I started to back up.

* * *

"[A]nd Sandy [Storey]—I mean I don't know if I was

stumbling back or stepping back, but I know she grabbed me, my arm, and said, 'Let's go', and we turned around and left, and that was it."

Both Stanchfield and the defendant testified that there were other people in the store during the time that defendant was in the store, but the testimony of these people revealed that they did not hear what was said between Stanchfield and the defendant.

Storey testified that she remained in the car while defendant went into the store but that after waiting a reasonable time she went inside to see what was happening. As she approached the defendant she heard Stanchfield say "just promise you will never do that again and I won't take you license number". She then took defendant's arm, turned around, gave Stanchfield an "apologetic smile", and took defendant back to the car. Once in the car, defendant told Storey what had happened in the store, saying "but I told her [Stanchfield] I was only kidding". Defendant and Storey then drove to a shopping center where defendant was subsequently arrested.

The general attempt statute, under which defendant was prosecuted, provides in part as follows:

"Any person who shall attempt to commit an offense prohibited by law, and in such attempt shall do any act towards the commission of such offense, but shall fail in the perpetration, or shall be intercepted or prevented in the execution of the same, when no express provision is made by law for the punishment of such attempt, shall be punished * * *." MCL 750.92; MSA 28.287.

The elements of an attempt are (1) the specific intent to commit the crime attempted and (2) an overt act going beyond mere preparation towards

the commission of the crime. *People v Coleman,*
350 Mich 268; 86 NW2d 281 (1957), *People v
Youngs,* 122 Mich 292; 81 NW 114 (1899), *People v
Degraffenreid,* 19 Mich App 702, 708, fn 3; 173
NW2d 317 (1969), *People v Gardner,* 13 Mich App
16, 18; 163 NW2d 668 (1968), *People v Bowen,* 10
Mich App 1, 7; 158 NW2d 794 (1968), CJI 9:1:01, 2
Gillespie, Michigan Criminal Law & Procedure (2d
ed), § 1070, p 1014.[2] Considering the second ele-
ment first, it is clear that in the instant case
defendant committed sufficient overt acts. As the
trial court noted, there was evidence on every
element of an unarmed robbery except for the
actual taking of money.[3] From the evidence pre-
sented, including the evidence of defendant's intox-
ication, the question of whether defendant under-
took these acts with the specific intent to commit
an unarmed robbery is a much closer question.
After hearing all the evidence, however, the trial
court found that defendant possessed the requisite
intent and we do not believe that finding was
clearly erroneous. See *People v Anderson,* 64 Mich
App 218, 221; 235 NW2d 746 (1975).

Defendant raised an additional defense in the
trial court. Assuming that he committed the neces-
sary overt acts with the requisite specific intent,
defendant contended that he was not guilty be-
cause he voluntarily abandoned his criminal enter-
prise before consummating the offense attempted.
The defense was rooted in the language of the

[2] Some cases have stated that failure to complete the attempted
offense is a third element, *People v Bauer,* 216 Mich 659, 661; 185
NW 694 (1921). "Failure" is not, however, universally held to be an
element of the offense of attempt and Perkins argues strongly against
its inclusion. Perkins, Criminal Law (2d ed), ch 6, § 3, pp 552-557.

[3] For a more detailed discussion of the overt act requirement, see
*People v Bowen, supra,* Hall, General Principles of Criminal Law (2d
ed), pp 576-586, Model Penal Code (Tentative Draft No 10, 1960),
§ 5.01(1)(c), pp 39-48.

attempt statute, which refers to a person doing an act towards the commission of an offense and adds: "but shall *fail* in the perpetration, or shall be *intercepted* or *prevented* in the execution of the same". MCL 750.92; MSA 28.287. (Emphasis added.) Defendant argued that, under the statute, a person who abandons a criminal scheme of his or her own volition, instead of through the intervention of outside forces, has not committed an attempt. The prosecution argued that once the defendant had committed an overt act with the requisite intent, a punishable attempt had occurred which could not subsequently be abandoned. The trial court rejected defendant's arguments, holding that an attempt may still be shown even if the defendant fails to consummate the offense attempted due to a mere lack of perseverance. On appeal, defendant contends that the trial court erred in rejecting the legal basis of his defense.

Regardless of what else might be said on the subject, the authorities are in agreement that it is no defense that a defendant fails to carry through to completion the crime attempted because of the intervention of outside forces, because circumstances turn out to be different than expected, or because the defendant meets more resistance then expected. On the issue of voluntary renunciation of criminal purpose after an overt act beyond preparation but before the completion of the attempted crime, however, there are few reported cases nationwide and no general consensus. La-Fave & Scott, Handbook on Criminal Law, § 60, p 449, Model Penal Code (Tentative Draft No 10, 1960), § 5.01(4), p 69. The status of the law in Michigan is equally unclear, and there are apparently no cases under the general attempt statute

which clearly accept or reject the possibility of such a defense. See *People v Stephens,* 84 Mich App 250, 253; 269 NW2d 552 (1978), *lv den* 406 Mich 865 (1979), Michigan Second Revised Criminal Code (Final Draft, 1979), § 1020, p 115.[4]

Despite the lack of direction from the cases, the issue has continuously intrigued commentators and the authors of proposed criminal codes. Some commentators have espoused the traditional view that voluntary abandonment is not a defense where the elements of an attempt are already established, although it may be relevant to the issue of whether defendant possessed the requisite intent in the first place. Miller, Handbook of Criminal Law, § 29, p 100, Clark & Marshall, Law of Crimes (6th ed, Wingersky Rev), § 4.13, p 229. Under this view, once a defendant has gone so far as to have committed a punishable attempt, the crime is "complete" and he or she cannot then abandon the crime and avoid liability anymore than a thief can abandon a larceny by returning the stolen goods. Other commentators, however, emphasizing the differences between attempts and other crimes and focusing on the purpose of the law of attempts, contend that a truly voluntary abandonment of the attempted offense should be recognized as a defense to the attempt as well. This view was early on expressed by Wharton: "If an attempt be voluntarily and freely abandoned before the act is put in process of final execution,

---

[4] The dissent in *Stephens* clearly rejects the idea of such a defense, *People v Stephens, supra,* 255 (BEASLEY, P.J., dissenting). The dissent in *People v Youngs, supra,* 300, does state that the law "may refuse conviction when repentance and abandonment are shown", but, as with many older cases, it is unclear whether the abandonment spoken of is before or after the performance of an overt act. If before, then it is not really an issue of "abandonment" as that term is used here since there cannot in any event be a conviction for attempt without an overt act.

there being no outside cause prompting such abandonment, then this is a defense * * *". 1 Wharton, Criminal Law (12th ed), § 226.[5] Perkins, while acknowledging that this was not the "accepted view" at common law, nevertheless concedes that Wharton's position "has much to commend it". "[A]lthough a criminal plan has proceeded far enough to support a conviction of criminal attempt, it would be sound to recognize the possibility of a *locus penitentiae* so long as no substantial harm has been done and no act of actual danger committed". Perkins, Criminal Law (2d ed), ch 6, § 3, p 590.

LaFave & Scott similarly acknowledge that the position taken by the prosecution in the instant case is the "traditional view". Relying on the purpose of the law of attempts, however, they argue that this position is not the better view. The law of attempts seeks to plug the gap between mere criminal intent, which is not punishable, and the completed offense. Because "[t]he objectives of the criminal law would not be sufficiently served if the only action which could be taken against an attempt were on-the-spot prevention of the crime on that particular occasion", "one important function served by the crime of attempt is to provide a basis whereby law enforcement officers may intervene in time to prevent a completed crime. More precisely, attempt law makes possible preventive action by the police *before* the defendant has come dangerously close to committing the intended crime". LaFave & Scott, *supra,* § 59, pp 426, 427. (Emphasis in orginal.) (Footnote omitted.) Because these same purposes may also be served by a

---

[5] Wharton's original views appear, however, to have been abandoned by his revisors. See 1 Wharton's Criminal Law & Procedure (Anderson), § 76, p 161.

voluntary abandonment of the crime attempted, these commentators conclude that:

"On balance, the arguments in favor of recognizing voluntary abandonment as a defense to a charge of attempt are more persuasive than the arguments against the defense. For one thing, recognition of the defense is consistent with the rationale of attempt, as a complete and voluntary renunciation of criminal purpose 'tends to negative dangerousness.' In addition, if the defense is allowed, then those who have crossed the threshold of attempt will still be encouraged to desist and thereby escape any penalty. The counter-argument is that the defense may actually embolden those considering some criminal endeavor because they will be more willing to take the first steps toward the crime when they know they can withdraw with impunity. This risk, however, seems slight, as does the risk that recognition of the defense will result in the acceptance of false claims of repentance." LaFave & Scott, *supra,* § 60, p 450. (Footnotes omitted.)

For these reasons the drafters of various modern criminal codes have incorporated the defense of voluntary abandonment into the law of attempts. Section 5.01(4) of the Model Penal Code recognizes as a defense to an attempt crime the abandonment of efforts to commit the crime attempted under circumstances manifesting a complete and voluntary renunciation of criminal purpose. Based on this section of the Model Penal Code, the authors of the Michigan Second Revised Criminal Code recognized voluntary renunciation of criminal purpose as an affirmative defense to a prosecution for attempt.[6] The comments to § 5.01 of the Model

---

[6] "It is an affirmative defense to a prosecution under this section that, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the actor avoided the commission of the offense attempted by abandoning his criminal effort and, if mere abandonment is insufficient to accomplish this avoidance, that the actor took further and affirmative steps that prevented the

Penal Code (quoted extensively in the Michigan committee commentary) explain the bounds of the defense and the reasons for its recognition:

"By a 'voluntary' abandonment is meant a change in the actor's purpose not influenced by outside circumstances, what may be termed repentance or change of heart. Lack of resolution or timidity may suffice. A reappraisal by the actor of the criminal sanctions hanging over his conduct would presumably be a motivation of the voluntary type as long as the actor's fear of the law is not related to a particular threat of apprehension or detection.

\*   \*   \*

"The basis for allowing the defense involves two related considerations.

"First, renunciation of criminal purpose tends to negative dangerousness. As previously indicated, much of the effort devoted to excluding early 'preparatory' conduct from criminal attempt liability is based on the desire not to punish where there is an insufficient showing that the actor has a firm purpose to commit the crime contemplated. In cases where the actor has gone beyond the line drawn for preparation, indicating *prima facie* sufficient firmness of purpose, he should be allowed to rebut such a conclusion by showing that he has plainly demonstrated his lack of firm purpose by completely renouncing his purpose to commit the crime.

\*   \*   \*

commission thereof." Michigan Second Revised Criminal Code (Final Draft, 1979), § 1001(3), p 94.

"A renunciation is not 'voluntary and complete' within the meaning of this chapter if it is motivated in whole or in part by either of the following:

"(a) A circumstance which increases the probability of detection or apprehension of the defendant or another participant in the criminal operation or which makes more difficult the consummation of the crime.

"(b) A decision to postpone the criminal conduct until another time or to substitute another victim or another but similar objective." *Id.*, § 1020, p 113.

"A second reason for allowing renunciation of criminal purpose as a defense to an attempt charge is to encourage actors to desist from pressing forward with their criminal designs, thereby diminishing the risk that the substantive crime will be committed. While, under the proposed subsection, such encouragement is held out at all stages of the criminal effort, its significance becomes greatest as the actor nears his criminal objective and the risk that the crime will be completed is correspondingly high. At the very point where abandonment least influences a judgment as to the dangerousness of the actor—where the last proximate act has been committed but the resulting crime can still be avoided—the inducement to desist stemming from the abandonment defense achieves its greatest value.

"It is possible, of course, that the defense of renunciation of criminal purpose may add to the incentives to take the *first* steps toward crime. Knowledge that criminal endeavors can be undone with impunity may encourage preliminary steps that would not be undertaken if liability inevitably attached to every abortive criminal undertaking that proceeded beyond preparation. But this is not a serious problem. First, any consolation the actor might draw from the abandonment defense would have to be tempered with the knowledge that the defense would be unavailable if the actor's purposes were frustrated by external forces before he had an opportunity to abandon his effort. Second, the encouragement this defense might lend to the actor taking preliminary steps would be a factor only where the actor was dubious of his plans and where, consequently, the probability of continuance was not great.

"On balance, it is concluded that renunciation of criminal purpose should be a defense to a criminal attempt charge because, as to the early stages of an attempt, it significantly negatives dangerousness of character, and, as to later stages, the value of encouraging desistance outweighs the net dangerousness shown by the abandoned criminal effort." Model Penal Code (Tentative Draft No 10, 1960), § 5.01(4), pp 69-73. (Footnotes omitted, emphasis in original.)

The authorities do recognize a limitation on the defense of abandonment. If a defendant has taken the last proximate step toward the completion of the attempted offense and is powerless to prevent its consummation, yet fails to actually commit the ultimate offense for other reasons, it may be too late to abandon the criminal purpose and avoid liability for the attempt. A popular example concerns a defendant who, with the intent to kill, fires a shot toward the intended victim but misses the mark altogether or succeeds only in wounding his enemy. Under such circumstances, it would not be a defense to show that the intent to kill was abandoned after the shot was fired. On the other hand, a defendant who lights the fuse of a bomb but repents and stomps out the fuse before the explosion should be allowed to assert voluntary abandonment as a defense. In this second example, the possibility of avoiding criminal liability altogether, even at the last second, encourages the defendant to prevent the greater harm from taking place. As the comments to the Model Penal Code suggest, such encouragement is most important in these final seconds.

As noted above, the issue presented is one of first impression in this state. We are persuaded by the trend of modern authority and hold that voluntary abandonment is an affirmative defense to a prosecution for criminal attempt. The burden is on the defendant to establish by a preponderance of the evidence[7] that he or she has voluntarily and completely abandoned his or her criminal purpose. Abandonment is not "voluntary" when the defendant fails to complete the attempted crime because

---

[7] It is not unconstitutional to place this burden on the defendant since voluntary abandonment does not negate any element of the offense.

of unanticipated difficulties, unexpected resistance, or circumstances which increase the probability of detention or apprehension. Nor is the abandonment "voluntary" when the defendant fails to consummate the attempted offense after deciding to postpone the criminal conduct until another time or to substitute another victim or another but similar objective. Such a holding is not at odds with the terms of the statute, which refer to one who "fails", is "prevented", or is "intercepted" before completion of the attempted offense. Such language lends itself to a holding that voluntary abandonment is a defense. LaFave & Scott, *supra,* § 60, p 449, Model Penal Code (Tentative Draft No 10, 1960), § 5.01(4), pp 70-71.[8]

In the instant case, the trial court recognized that involuntary abandonment is not a defense, but it also rejected defendant's claim that voluntary abandonment was a defense. As a result, the trial court never determined whether defendant's abandonment was voluntary or involuntary. Accordingly, defendant's conviction is reversed and this case is remanded for a new trial at which defendant may present a defense of voluntary abandonment according to the guidelines set forth in this opinion. We recognize that the judge who presided at defendant's trial was forced to decide the issue without benefit of precedent established by the appellate courts of this state. We are persuaded, however, that the defense of voluntary abandonment is in accord with the rationale of the law of attempts and that the defendant is entitled to present such a defense.

Reversed and remanded.

[8] Under the South Dakota attempt statute, for example, which is substantially similar to that of Michigan, the failure to complete the attempted offense must be due to intervening circumstances apart from, and independent of, the will of the defendant. *State v Martinez,* 88 SD 369; 220 NW2d 530 (1974), *State v Judge,* 81 SD 128; 131 NW2d 573 (1964).

R. B. Burns, P.J., concurred.

J. T. Kallman, J. *(dissenting).* I respectfully dissent. The facts clearly show the elements of an attempt in this case. There was a specific intent to commit unarmed robbery. There were overt acts that went beyond mere preparation. The clerk was getting the money out of the cash register for the defendant at his command. The attempted unarmed robbery had been completed.

The question then arises that if the attempt has been accomplished, why did the defendant suddenly discontinue the efforts necessary to complete the criminal act. We have before us a record, and that is all we can rely on. This record reflects a number of reasons why the criminal act may have been terminated:

1) The defendant's statements that he wouldn't do it to her *this* time because you're good-looking.[1]

2) As defendant made this statement a woman came in and directed defendant out of the store.

3) There were other people in the store while defendant was there and the record does not reveal the effect this may have had on defendant's choosing to discontinue the crime.

The statute, MCL 750.92; MSA 28.287, as quoted in the majority opinion, reads in part: "but shall fail in the perpetration, *or* * * *". (Emphasis added.)

One notes here that the statute is in the disjunctive. Granted, the defendant was not *intercepted* or *prevented* from completing the crime. However, under the statute he clearly *failed* in the perpetration of the crime, whatever the reason. The statute does not say that if a defendant voluntarily discon-

---

[1] But note he said that next time he'd do it even if she were there. The criminal intent had not been abandoned.

tinues the criminal act the attempt fails. Nor does it say if a defendant involuntarily discontinues the criminal act the attempt succeeds. Where the statute, as here, says that when a defendant *shall fail* in the perpetration of a crime, that is enough to convict for an attempt. The statute is clear and unambiguous, clearly permitting, under the facts in this case, a conviction for an attempt.

In *People v Stephens,* 84 Mich App 250, 255; 269 NW2d 552 (1978) Judge BEASLEY stated: "I would agree with the trial court that it was legally too late for defendant Stephens to abandon his criminal intent".

That is the situation in this case. The defendant had progressed too far into the crime to assert now the defense of voluntary abandonment. This was even recognized by the defendant when he told Stanchfield (unrebutted testimony): "You could only get me on attempted anyway".

I would affirm the conviction and sentence.