PEOPLE v HARDING

PEOPLE v REIDT

PEOPLE v HARRINGTON

PEOPLE v DESORCY

Docket Nos. 81820, 83055, 85938, 86961. Submitted November 5, 1986,
at Lansing. Decided September 22, 1987. Leave to appeal applied
for.

Defendants Brent Harding, Alexander K. Harrington and David
E. Desorcy were convicted following a jury trial in the Oakland
Circuit Court of conspiracy to deliver over 650 grams of cocaine
and delivery of a controlled substance. The trial court, Freder-
ick C. Ziem, J., sentenced defendants to life imprisonment.
Defendant Douglas P. Reidt was convicted following a bench
trial in the Oakland Circuit Court of the same offenses and the
trial court, David F. Breck, J., sentenced him to life imprison-
ment. The defendants appealed. The appeals were consolidated
by the Court of Appeals.

The Court of Appeals *held:*

1. The trial court did not properly apply the objective test in
denying defendant Harding's motion to dismiss on the basis of
entrapment. The finding that Harding was not entrapped was
clearly erroneous. Defendant Harding was entrapped as a
matter of law.

2. The record does not support defendant Reidt's claim that

REFERENCES

Am Jur 2d, Conspiracy §§ 1 *et seq.*, 13, 40 *et seq.*

Am Jur 2d, Criminal Law §§ 158 *et seq.*, 202 *et seq.*, 535 *et seq.*

Am Jur 2d, Drugs, Narcotics, and Poisons §§ 16 *et seq.*

Am Jur 2d, Trial §§ 469 *et seq.*

Modern status of rule regarding necessity of instruction on circum-
stantial evidence in criminal trial—state cases. 36 ALR4th 1046.

Validity of state statute imposing mandatory sentence or prohibit-
ing granting of probation or suspension of sentence for narcotics
offenses. 81 ALR3d 1192.

Offense of aiding and abetting illegal possession of drugs of narcot-
ics. 47 ALR3d 1239.

Entrapment to commit offense with respect to narcotics law. 33
ALR2d 883.

he was entrapped by the police. The trial court did not err in denying Reidt's motion to dismiss on the basis of entrapment. In addition, Reidt was not denied due process, nor does the record support Reidt's claim of ineffective assistance of counsel.

3. The record establishes a reasonable inference that defendant Harrington's acts and conduct established his participation in the conspiracy beyond a reasonable doubt. The evidence also proves beyond a reasonable doubt Harrington's involvement as an aider and abettor in the delivery of cocaine. The trial court properly denied Harrington's motion for a directed verdict. The evidence established at least an attempt to deliver the cocaine.

4. Even assuming, arguendo, that the lower court erred in denying defendant Desorcy's motion to suppress the evidence, the error was clearly harmless beyond a reasonable doubt. The trial court did not err in denying Desorcy's motion to present nontestimonial evidence of a speech impediment to the jury. The trial court properly denied Desorcy's motion for a directed verdict. The evidence established that Desorcy was a participant in the conspiracy and an aider and abettor to the delivery. Defendant Desorcy was properly sentenced to life imprisonment for his conspiracy conviction.

5. The mandatory life sentence for conviction of delivery of 650 grams or more of cocaine is not cruel or unusual punishment.

The conviction of defendant Harding is reversed and he is ordered discharged. The convictions of defendants Reidt, Harrington and Desorcy are affirmed.

D. E. Holbrook, Jr., P.J., dissented from the majority's holding that a mandatory life sentence for conviction of conspiracy to deliver over 650 grams of cocaine does not constitute cruel or unusual punishment.

1. Criminal Law — Entrapment — Objective Test.

A trial court, in deciding an entrapment question, should apply the objective test for entrapment which focuses on the conduct of the police; the test requires the court to find entrapment when the government agent's conduct goes beyond merely offering an opportunity to commit the offense; the agent's conduct must be the kind that could induce or instigate the commission of a crime by one not ready and willing to commit it, regardless of the character or propensities of the particular person induced.

2. Criminal Law — Entrapment — Burden of Proof.

A defendant who alleges that he was entrapped into committing

an offense has the burden of proving entrapment by a preponderance of the evidence.

3. CRIMINAL LAW — ENTRAPMENT — FINDINGS OF FACT.

A trial court, deciding an entrapment question, should make specific findings of fact and determine whether the police conduct was of such a nature that it would induce the commission of a crime by an otherwise unwilling or unready person.

4. CRIMINAL LAW — ENTRAPMENT — GOVERNMENT AGENTS.

Persons who are not law enforcement officials but who act with official encouragement or assistance should be treated as government agents for purposes of deciding an entrapment issue.

5. CRIMINAL LAW — ASSISTANCE OF COUNSEL — MULTIPLE REPRESENTATION.

Representation of two codefendants by one attorney can potentially lead to a conflict of interest great enough to deprive one or both of the defendants of effective assistance of counsel; such a conflict of interest is never presumed or implied; a defendant establishes a prima facie case of ineffective assistance of counsel if the defendant on appeal can show that an actual conflict of interest affected the adequacy of his representation.

6. CRIMINAL LAW — ASSISTANCE OF COUNSEL — MULTIPLE REPRESENTATION.

A Michigan Court Rule outlines the procedure a court must follow when faced with a situation involving the multiple representation of two or more defendants by one attorney; although the court rule is written in mandatory terms a violation of the guidelines provided by the court rule does not perfect a claim of ineffective assistance of counsel (MCR 6.101[C][4]).

7. MOTIONS AND ORDERS — DIRECTED VERDICTS.

A trial court, when ruling on a motion for a directed verdict of acquittal, must view the evidence presented in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.

8. CONSPIRACY — SPECIFIC INTENT.

A conspiracy is a mutual agreement or understanding, expressed or implied, between two or more persons to commit a criminal act or to accomplish a legal act by unlawful means; a two-fold specific intent is required: (1) the intent to combine with others, and (2) the intent to accomplish the illegal objective.

9. CONSPIRACY — EVIDENCE.

A conspiracy may be proven by circumstantial evidence or based on inference; direct proof of an agreement is not required, nor is it necessary that a formal agreement be proven; it is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact.

10. CRIMINAL LAW — AIDING AND ABETTING.

The phrase "aiding and abetting" describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds which may support, encourage or incite the commission of the crime.

11. CONTROLLED SUBSTANCES — DELIVERY.

"Delivery" of a controlled substance is the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship; actual delivery is not required (MCL 333.7105[1]; MSA 14.15[7105][1]).

12. CRIMINAL LAW — ATTEMPT.

The elements of a criminal attempt are the specific intent to commit the crime intended coupled with an overt act going beyond mere preparation towards the commission of the crime; it is no defense that a defendant fails to carry through to completion the crime intended because of the intervention of outside forces, because circumstances turn out to be different than expected, or because the defendant meets more resistance than expected.

13. CRIMINAL LAW — SENTENCING — CONSPIRACY TO DELIVER COCAINE — MANDATORY LIFE SENTENCES — CRUEL OR UNUSUAL PUNISHMENT.

A defendant convicted of conspiracy to deliver 650 grams or more of cocaine must be sentenced to life in prison; such mandatory sentence does not constitute cruel or unusual punishment (US Const, Am VIII; Const 1963, art 1, § 16; MCL 750.157a; MSA 28.354[1]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief, Appellate Division, and *Margaret G. Horenstein* and *Richard H. Browne,* Assistant Prosecuting Attorneys, for the people.

*Faintuck, Shwedel & Wolfram* (by *William G. Wolfram*), and Brent Harding, in propria persona.

*Hertz & Schram, P.C.* (by *Martin Reisig* and *Harriet Demetriou*), for Douglas Reidt.

*Carl Ziemba,* for Alexander Harrington.

*James D. O'Connell,* for David Desorcy.

Before: D. E. HOLBROOK, JR., P.J., and ALLEN and P. J. CLULO,* JJ.

PER CURIAM. Defendants Brent Harding, Alexander Kilgour Harrington and David Eugene Desorcy were convicted of conspiracy to deliver over 650 grams of cocaine, MCL 750.157a; MSA 28.354(1), and delivery of a controlled substance, MCL 333.7401, subds (1) and (2)(a)(i); MSA 14.15(7401) subds (1) and (2)(a)(i), after a jury trial held in October of 1984 in Oakland Circuit Court. Defendant Douglas Patrick Reidt was convicted of conspiracy to deliver over 650 grams of cocaine, MCL 750.157a; MSA 28.354(1), and delivery of a controlled substance, MCL 333.7401 subds (1) and (2)(a)(i); MSA 14.15(7401) subds (1) and (2)(a)(i), after a bench trial held in December of 1984 in Oakland Circuit Court. All defendants were sentenced to two concurrent mandatory terms of life imprisonment and appeal from all of their convictions as of right. These cases were consolidated for appeal by order of this Court. As each defendant has presented different issues, each case will be discussed individually.

### DEFENDANT HARDING

Prior to trial, defendant Harding moved for

---

* Circuit judge, sitting on the Court of Appeals by assignment.

dismissal on the basis of entrapment and a hearing was held on that issue. The trial court, after hearing the testimony, denied defendant's motion to dismiss. We reverse as to defendant Harding and find that he was entrapped as a matter of law.

The nature of this defendant's appeal requires a detailed factual recitation. The facts which follow are largely uncontested except where indicated. Additional facts will be set out in the discussion of the entrapment issue.

Defendant Harding was convicted for trafficking in hashish in Gibralter in 1974. In 1978 he was convicted in Mexico for possession of one gram of cocaine. He served one year in prison in Mexico and was transferred to Canada where he served a second year before being paroled. By late 1983, defendant Harding, a Canadian citizen, was living in Kitchener, Ontario, with his wife and working as a welder.

In early 1983, defendant Harding met defendant Douglas Reidt. Reidt, also a Canadian citizen, was a hairdresser and had previously owned a men's clothing store which failed, leaving him unemployed. The two men frequently saw each other to play cards, drink beer and "do" cocaine. Reidt sold small amounts of cocaine to friends, including defendant Harding, in order to pay for his own cocaine use. He had never been involved in large-scale drug transactions.

In December, 1983, defendant Harding was contacted by Sue Ellen Clapper. She had been arrested in August, 1983, in possession of seven hundred grams of cocaine. After her arrest she agreed to cooperate with Jerry Myny, an undercover officer with the County of Macomb Enforcement Team (COMET). Clapper knew she faced mandatory life in prison and that she could help her

own situation by helping COMET. Clapper's plea was held in abeyance pending her cooperation with the police. Under pressure to arrange a drug deal, Clapper chose to focus on defendant Harding. Two years prior, in late 1981, defendant Harding became involved with Clapper in bringing two hundred grams of cocaine from Colombia to the United States. Clapper believed she was free to use any scheme she wanted to make contact and arrange a meeting with defendant Harding. She devised a story that she was to be married and wanted defendant Harding to attend the wedding. Defendant Harding's phone number was unlisted so Clapper related her story to defendant Harding's mother and two brothers on several occasions in an effort to learn his phone number. Defendant Harding's relatives testified as to Clapper's persistence. Finally, one of defendant Harding's brothers gave Clapper his phone number. Clapper contacted defendant Harding and arranged a meeting so he could meet her "fiancé" (Myny). None of Clapper's phone calls to Harding or his relatives were monitored by COMET nor did Clapper tell Myny what she had to do to reach Harding.

On December 14, 1983, Clapper, Myny (introduced as Clapper's fiancé), Harding and his wife Cory, met for dinner at the Windsor Chop House in Windsor, Ontario. Clapper, Myny and Harding all testified that sometime during dinner Clapper told Harding of a drug deal in which she received almost a kilo of cocaine. Clapper told Harding that the cocaine had been stolen and that she owed the Colombian suppliers $30,000. Myny corrected her and said the amount was $51,000. Clapper and Myny sought defendant Harding's assistance in arranging a drug deal in order to raise money to pay back Clapper's fictitious supplier. Myny passed

himself off as a corporate attorney who had access
to large sums of money to pay for the drugs.
Defendant Harding testified that because of his
past experience with Colombian suppliers he be-
lieved Clapper was in a life-and-death situation.
He and his wife testified that Clapper stressed the
life-and-death situation but Clapper and Myny
testified that Clapper never said that she feared
for her life; however, Myny testified that defen-
dant Harding expressed concern that Clapper
could be in physical danger. Harding claims that
he was negative throughout this meeting, suggest-
ing that Clapper contact other people to arrange a
deal. Clapper and Myny, however, thought defen-
dant Harding was willing to cooperate with them.
In any event, no deal was struck at that meeting.

The day after the December 14 meeting, defen-
dant Harding visited defendant Reidt. Defendant
Harding related Clapper's "predicament," his con-
cern for her safety and how he was thinking of
helping her.

A second meeting between defendant Harding
and Myny was arranged for December 20, 1983, in
London, Ontario. On that day, defendant Harding
tried to contact Myny to cancel the meeting. He
couldn't reach Myny so he called Clapper and told
her that he was not interested in the deal and that
the meeting was off. Clapper told Harding that she
couldn't reach Myny so it was too late to cancel
the meeting. Myny had instructed Clapper to as-
sure Harding that the meeting would be held.
Harding went to the second meeting with his wife
and told Myny that he didn't want anything to do
with drugs. Myny made appeals to Harding's
friendship with Clapper but Harding remained
opposed to the deal. Myny left the meeting openly
"agitated" and "upset" with Harding. Myny then
called Clapper and told her to call Harding and

"ream him out." Myny told Clapper that, if a drug
deal was not arranged through Harding, he would
be forced to say Clapper had blown his cover.
Clapper called Harding and "chewed him out" and
"more or less raised cain." Harding testified that
Clapper "ranted and raved" when she called, cry-
ing about how she would be killed if she didn't pay
back the money she owed. Myny acknowledged
that he knew that Harding was concerned about
the danger to Clapper's physical well-being.

Myny made a continuous effort to get Harding
to participate in a drug deal. Harding's wife testi-
fied that Myny made fifty phone calls. Myny,
however, testified that he made thirty-eight phone
calls and Harding returned eighteen. Harding was
reluctant to get involved and had become annoyed
with Myny's persistent phone calls. On several
occasions Harding's neighbor, roommate, and fam-
ily members overheard Harding tell someone on
the phone to leave him alone and quit calling.
Harding was always visibly upset after receiving
such calls. In an effort to cut off his relationship
with Myny, Harding testified that he introduced
Myny to people in Sarnia, Ontario, who allegedly
could set up a drug deal. Harding's intent was to
have Myny transact with the people while Har-
ding "went on with his life."

According to Myny's testimony, Harding ar-
ranged a drug deal to take place on January 8,
1984. The deal and a preliminary meeting fell
through, but on January 14, 1984, Harding and
Myny met at the Eaton Mall in Sarnia, Ontario.
Two other individuals, presumably the sellers,
were present at the meeting. A deal was arranged
but a definite date was not set. On January 30 and
31, Myny called Harding about the deal. Myny
offered to buy two kilos of cocaine that Harding
said was in Canada. A meeting was scheduled for

February 2, 1984, to discuss the details, but Harding never showed up. The meeting was rescheduled for February 3, 1984, but Myny testified that he was reluctant to set up the meeting until one of the two individuals who were present at the January 14 meeting was back in town. A meeting was scheduled for February 4, 1984, but Harding informed Myny that a drug bust has occurred in Buffalo, New York, and one of the individuals who was to supply Myny was allegedly involved.

On February 5, 1984, Myny called Harding to inform him that they had one week to do business because Myny was leaving town for a few weeks. Harding told Myny he would have the Sarnia dealers call Myny back. Myny didn't hear from anyone and testified that the relationship had ended on February 5, 1984.

On March 31, 1984, Myny reinstated contact with Harding, fifty-five days after their relationship had seemingly ended on February 5, 1984. A meeting was arranged at which Harding told Myny he was reluctant to become involved in the deal because he didn't trust him, stating, "Don't call me, I'll call you." Shortly thereafter, Myny returned to his regular job with the Sterling Heights Police Department. In late April, approximately twenty days from Myny's March 31 call, Myny received word that Harding had called the undercover phone number and wanted to speak with Myny. Myny returned Harding's call and a meeting was arranged for April 30, 1984.

On April 30, 1984, Harding, defendant Reidt, and Myny met at the Falls Lounge at the Holiday Inn in London, Ontario. After speaking a while, Reidt left and Harding told Myny that Reidt had to go see someone. Harding and Myny went next door to the Ali Baba Restaurant, where Reidt later met them. Harding testified that Clapper's situa-

tion was discussed again. Myny did not deny that testimony and recalled that at the preliminary examination he had testified that he had told Harding and Reidt that Clapper had a "problem" and also used cocaine.

Myny proceeded to arrange a deal to buy three kilos of cocaine in the United States. Harding and Reidt asked Myny about the criminal penalties in the United States for drug dealing. Myny replied that he had no idea because he was a corporate rather than criminal lawyer. The meeting ended. Reidt went looking for a supplier and subsequently found someone from whom he had never previously bought. The date for the transaction was postponed three times while Reidt and Harding waited for the supplier to make definite arrangements.

On May 17, 1984, Harding drove to Michigan to confirm that Myny had the money. On May 18, 1984, Myny, Harding, and Reidt met at the Holiday Inn in Troy to work out the details of the sale. Myny discussed the details of the sale with Reidt, out of Harding's presence. Harding remained at the Holiday Inn while Reidt took Myny to a motel room in the nearby Red Roof Inn where the seller had left the cocaine in a locked suitcase. Myny arrested Reidt in the hotel room and Harding was arrested back at the Holiday Inn.

Following the hearing on Harding's motion to dismiss the lower court summarized the testimony and then made the following findings and conclusions of law:

> The Court has carefully taken into consideration all the facts suggested by the defendants here—the factors that—of the previous friendship and the ties between the parties and the defendant's sympathies and the promise of leniency and freedom to that person.

And the fact that the—the claim that the defendants declined repeated requests before eventually —engaging in the criminal conduct.

It is a close question involved here for the Court to decide and it is a decision for the Court to make. There's no question that—in an entrapment hearing that the defendant bears the burden of proving his claim by a preponderance of the evidence.

There is no question that the law in Michigan is the objective test—the substance of law, which is applicable to the presumption of evidence and entrapment here is controlled by the objective test —and this is set forth in the cases and the objective test—concerns whether the actions of the police were so reprehensible under the circumstances that the police—that the Court should refuse as a matter of public policy to permit a conviction to stand.

The Court has reviewed everything that has been presented and bearing in mind all the law that is involved and that the burden rests upon the People. The Court is particularly concerned with the fact that after a hiatus of some substantial duration of approximately a month, in which there was no contact made between the parties and Sergeant Myny and the defendants and then Sergeant Myny had been transferred back to his home office unit that the defendant Harding then reinstituted the contact with Sergeant Myny.

He requested a meeting in London, Ontario on April the 30th, 1984 and at that meeting, the defendants Reidt and Harding agreed to sell to Myny the three kilos of cocaine at $50,000.00 each.

And on May the 18th, they in fact delivered, as promised, and whatever previous reluctance that had existed, if any, on the part of the—of the defendants had been overcome by the—by this factual situation.

This Court having taken into consideration everything, is of the opinion that the defendants have not met their burden of proof of proving entrapment, and that the—therefore the motion to

dismiss, due to entrapment, is denied and the matter is set down for trial.

In *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), the Supreme Court adopted the objective test for entrapment which focuses on the conduct of the police. The objective test requires that a trial court dismiss the charges against a defendant when the government agent's conduct goes beyond merely offering an opportunity to commit the offense. The agent's conduct must be the kind that could induce or instigate the commission of a crime by one not ready and willing to commit it, regardless of the character or propensities of the particular person induced. *Id.* at 21, citing *United States v Russell,* 411 US 423, 441-445; 93 S Ct 1637; 36 L Ed 2d 366 (1973) (Stewart, J., dissenting). "The challenge focuses exclusively upon the nature of the police conduct which, if improper, will not be mitigated, justified or excused in any fashion by the disposition of the accused." The defendant has the burden of proving entrapment and must do so by a preponderance of the evidence. *People v D'Angelo,* 401 Mich 167, 182; 257 NW2d 655 (1977). In deciding the entrapment question, the trial judge should make specific findings of fact. The ultimate disposition of the issue is subject to appellate review under the "clearly erroneous" standard. *Id.* at 183.

The facts of each case must be examined before the court can determine whether the police conduct was of such a nature that it would induce the commission of a crime by an otherwise unwilling or unready person. *People v Wisneski,* 96 Mich App 299; 292 NW2d 196 (1980), lv den 409 Mich 928 (1980). Since the focus of the objective test is on police conduct, we must concentrate on the actions of Officer Myny and Sue Ellen Clapper.

Under the facts of this case, Clapper must be regarded as an agent of the police. In *People v Stanley,* 68 Mich App 559, 564; 243 NW2d 684 (1976), the Court stated:

> "When persons who are not law-enforcement officials act with official encouragement or assistance, they should be treated as government agents for purposes of the entrapment defense. Otherwise, its protection could be avoided by indirection." Notes, 73 Harv L Rev 1333, 1341 (1960).

The application of the *Turner* "objective test" is indeed put to the test on these facts. There is a certain allure to the concurring opinion of Justice WILLIAMS in *People v Turner, supra,* where he argued for a dual focus on both the conduct of law enforcement officials and the conduct of the defendant, *id.* at 24-25. However inviting that may be when focusing on the background and conduct of defendant Harding, we will resist the temptation and address the issue of the nature of the police conduct in this case.

Our review of the record shows that there were some factual disputes; however, the lower court never resolved them. Rather, the court merely summarized the evidence. The only finding of fact that the court made and concentrated on was this defendant's contacting of the undercover officer after a twenty-day hiatus, totally ignoring the fact that previous to that contact there was a fifty-five-day break which ended with Myny contacting this defendant. This cannot be viewed as a proper application of the objective test. To the extent that the court found facts, they were directed at this defendant's conduct and not that of the police and their agents. Our view of the factual record convinces us that, when viewing the conduct and actions of law enforcement personnel that led to

the arrest and conviction of defendant Harding, there are elements of every type of reprehensible police conduct which have been reviewed by this Court and found to be supportive of an entrapment claim.

An important aspect of this case is the criminal status of Clapper. See *People v Duis,* 81 Mich App 698, 703; 265 NW2d (1978); *People v Asher,* 67 Mich App 174; 240 NW2d 749 (1976). Clapper was arrested in 1983 in possession of seven hundred grams of cocaine. Clapper knew she faced mandatory life in prison and that she could benefit by cooperating with Myny and COMET. Clapper's plea was therefore held in abeyance pending her cooperation with the police. Under pressure by Myny to arrange a drug deal, Clapper chose to involve defendant Harding. On one occasion, Clapper was reminded by Myny that he would be forced to say that Clapper had blown his cover if a drug deal was not arranged through defendant Harding. This is the kind of activity condemned in *Duis, supra.*

Another important factor we must consider is whether the government agent pressured this defendant into arranging a drug deal. *Duis, supra* at 703. In *People v Larcinese,* 108 Mich App 511, 515-516; 310 NW2d 49 (1981), this Court succinctly stated the policy behind finding entrapment based on police pressure: "The police should not be permitted to set someone up and attempt to pressure him into a crime for an extended period of time and then claim that their questionable actions in no way induced a subsequent crime." Harding was not only pressured by Officer Myny and Clapper, he was badgered and harassed by them. Clapper made contact with Harding in December, 1983. Both Clapper and Myny continued to call and meet with Harding until February 5, 1984, when

Myny's relationship with Harding "seemingly" ended. However, fifty-five days later Myny reinstituted contact with Harding and continued to call him in an effort to involve Harding in a drug deal. Myny and Clapper remained persistent in their efforts to involve Harding in a drug deal notwithstanding Harding's reluctance to become involved. On more than one occasion, Harding informed Myny and Clapper that he didn't want anything to do with the deal. After Harding refused their plea for help on December 20, 1983, Myny called Clapper with orders to call Harding and "ream him out." Clapper called Harding and, according to her own testimony, "chewed him out" and "more or less raised cain." Harding testified that Clapper "ranted and raved" when she called, crying about how she would be killed if she didn't pay back the money she owed. Harding finally gave in and became involved in a drug deal on May 18, 1984, approximately six months after Clapper first contacted him.

Appeals to a defendant's sympathy and friendship have also been a basis for finding entrapment. In *Turner, supra,* a police informant invented a story of an addict girlfriend to play on defendant's sympathy. That appeal to sympathy and friendship, along with police pressure and other factors, led our Supreme Court to find entrapment as a matter of law. This Court has found entrapment when the police exploit and abuse a friendship between a defendant and a police informant in order to solicit drug sales. See *Duis, supra, People v Gratzer,* 104 Mich App 705; 305 NW2d 300 (1981), lv den 411 Mich 961 (1981); see also *People v Wisneski, supra.*

Clapper, acting under pressure by the police, devised a scheme meant to evoke Harding's sympathies. The friendship between Harding and Clap-

per is important because without it Harding would not have become involved. Harding testified that he believed Clapper was in physical danger. He was led to believe that if he didn't help Clapper she would be physically harmed. This theme runs throughout the dealings between Clapper, Myny and defendant Harding. While it is clear that the relationship between Clapper and Harding had been created prior to any police involvement, the appeal to defendant's sympathies as an inducement to break the law cannot be ignored in this case. *Duis* and *Turner, supra,* both addressed this issue. As stated in *Duis, supra* at 703:

It is true that the friendship between (the informant) and defendant was created independent of any police involvement. But the friendship was later cultivated and kept alive solely for the purpose of inducing defendant to sell drugs.

Another aspect of police conduct which is noted in *Duis* and *Turner* is the danger of allowing police agents who are themselves caught up in criminal activity to operate without close supervision. There is an inherent danger in allowing an accused felon caught up in the criminal activity to go fishing for crime. As stated in *Duis, supra* at 702-703:

The police did not investigate defendant to ascertain if he was a drug dealer. By failing to adequately supervise (the informer's) activity, the police allowed him to select any victim he wished. The employment of (the informer), a convicted felon, awaiting trial on yet another felony, to induce defendant to sell drugs, offends decent standards of law enforcement. It is precisely the overreaching police conduct condemned in (*People v Turner, supra.*).

The facts of this case bear the point out well. Clapper was allowed to operate without supervision, to choose her own target, and to do whatever was necessary to make the initial contact with this defendant. In exchange for all of her efforts, she was allowed to plead guilty to a reduced charge thus extracting herself from a felony charge which carries mandatory sentence of life imprisonment.

Finally, we do not believe that the lower court properly applied the objective test. In the limited findings of fact the judge did make, he concentrated on one aspect of defendant's conduct and did not focus closely on the police conduct that induced the defendant to commit the crime. The people make much of the lower court's opportunity to hear the witnesses and find facts based on the testimony presented. However, it should be noted that, while the lower court summarized the testimony accurately, the specific finding of fact was a very limited finding focusing on the defendant and not complete in any event. For that reason, we find the lower court's finding to be clearly erroneous. We find that defendant Harding was entrapped as a matter of law.

### DEFENDANT REIDT

The first question presented by defendant Reidt is the entrapment issue. He, like Harding, argues that the lower court erred in failing to find entrapment. The first question raised by the people is Reidt's standing to raise the entrapment issue. That question has been addressed by this Court in *People v Matthews,* 143 Mich App 45, 54-55; 371 NW2d 887 (1985). Therein, the Court cited the following rule:

> [A] defendant lacks standing to raise the entrapment defense where an informant's activities were

directed only at a codefendant and were not within the knowledge of the defendant, whose furnishing of the controlled substance appeared to be solely to conduct an illegal enterprise for profit. *People v Soltis,* 104 Mich App 53, 55; 304 NW2d 811 (1981), lv den 411 Mich 1037 (1981). On the other hand, where charges against a defendant and codefendant arose from the same impermissible police conduct, it was proper for a trial court to apply its entrapment findings to both defendants. *People v Weatherford,* 129 Mich App 359; 341 NW2d 119 (1983), lv den 417 Mich 1100.33 (1983).

The Court went on to note in *Matthews* that, while the police conduct was aimed at one defendant, the codefendant was ultimately aware of certain aspects of the undercover activity. Because of that fact and the fact that Reidt had joined codefendant Harding in raising the entrapment issue, we will address Reidt's claim of entrapment. As indicated previously, while there was substantial, undisputed and uncontradicted evidence of police persistence and appeals to sympathy and friendship directed towards defendant Harding, and while the record is also clear that Harding told Reidt about his contacts with the undercover officer and the police informant, there is no testimony of any direct contact between the police informant and Reidt. In fact, defendant Reidt testified that his sympathy was not for Clapper but more for Harding. He only met Officer Myny on April 30, 1984, before the sale took place and again when the sale actually took place on May 18, 1984.

Reidt's argument primarily goes to the question of the taint on the entire transaction because of the reprehensible police conduct directed at Harding. Here, he relies on *People v Weatherford,* 129 Mich App 359; 341 NW2d 119 (1983). This argu-

ment was addressed in *People v Crawford,* 143
Mich App 348, 353-354; 372 NW2d 550 (1985):

> In *People v Larcinese,* 108 Mich App 511, 515;
> 310 NW2d 49 (1981), the Court explained that
> misconduct by police or their agents will not nec-
> essarily taint all similar or related transactions.
> Instead, the facts and circumstances of each case
> must be examined to determine whether a defen-
> dant was entrapped. We acknowledge that the
> entire course of the investigation is relevant in
> applying the objective test of entrapment, but
> reprehensible conduct by police and their agents,
> even where the conduct involves the same defen-
> dant, will not support a finding of entrapment
> unless it induced or instigated the crime at issue.
>
> Defendant's reliance on *People v Weatherford,*
> 129 Mich App 359, 361; 341 NW2d 119 (1983), is
> misplaced. *Weatherford* contains merely an ob-
> scure statement that the trial court did not err by
> applying its findings as to entrapment to both
> defendants, because the charges against both de-
> fendants arose out of the same impermissible con-
> duct on the part of the police and their agent.
> Nothing in the opinion suggests that it is author-
> ity for the broad proposition that reprehensible
> police conduct will taint an entire investigation
> without regard to its relation to the defendant or
> the crime at issue.

It is interesting to note that defendant Reidt testi-
fied that he often told defendant Harding that he
did not want anything to do with a drug deal.
However, he never expressed any reluctance to
participate in a deal when he met with Officer
Myny on April 30, 1984, and some eighteen days
later did in fact participate in such a deal.

The record does not support this defendant's
claim that he was entrapped by the police. The
lower court did not err in denying defendant
Reidt's motion to dismiss because of entrapment.

Defendant Reidt next argues that the police conduct in this case is so egregious as to violate his fundamental right of due process under both the United States and Michigan Constitutions. He makes this argument independent of the entrapment defense and cites a New York case in support of the proposition. *People v Isaacson,* 44 NY2d 511; 406 NYS2d 714; 378 NE2d 78 (1978). In that case, the New York Court of Appeals found that a conviction had been obtained by police conduct which was violative of due process even though the defendant failed to meet his burden of establishing entrapment by a preponderance of the evidence. We are not persuaded by defendant's argument, nor do we find *Isaacson* persuasive or relevant to the Michigan objective test as enunciated in *People v Turner, supra.* The objective test in fact does focus on police conduct and by its very nature incorporates the due process considerations argued by defendant in the entrapment hearing itself. In addition, although not raised on appeal, Reidt requested that the lower court submit the issue of entrapment to the jury. The lower court properly denied that request. *People v D'Angelo, supra.*

Next, defendant Reidt raises the question of the effective assistance of counsel, which he claims was denied him because of the fact that on the first day of the entrapment hearing in the lower court both he and defendant Harding were represented by one attorney. This issue arises because of the fact that defendant Harding's attorney was absent on the first day of the entrapment hearing. When he returned on the second day he stated on the record that Martin Reisig, defendant Reidt's attorney, could continue to take the testimony and that he would assist him at counsel table. Each

attorney did give closing argument on behalf of his respective client after the testimony.

Representation of two codefendants by one attorney can potentially lead to a conflict of interest great enough to deprive one or both of the defendants of effective assistance of counsel. *Holloway v Arkansas,* 435 US 475; 98 S Ct 1173; 55 L Ed 2d 426 (1978). Such a conflict of interest is never presumed or implied. However, if a defendant on appeal can show that an actual conflict of interest affected the adequacy of his representation, he has established a prima facie case of ineffective assistance of counsel. *Cuyler v Sullivan,* 446 US 335, 348-350; 100 S Ct 1708; 64 L Ed 2d 333 (1980).

MCR 6.101(C)(4) helps obviate potential claims of ineffective assistance of counsel by outlining the procedure a court must follow when faced with a joint representation situation. Although the rule was written in mandatory terms, this Court has held that a violation of its guidelines does not perfect a claim of ineffective assistance of counsel. *People v Gamble,* 124 Mich App 606, 610; 335 NW2d 101 (1983).

The record does not support the claim that a conflict of interest arose between the defendants when they were represented by one attorney on the first day of the entrapment hearing. When defendant Harding's attorney returned on the second day, neither attorney chose to recall any of the witnesses whose testimony was taken in the attorney's absence. Each attorney gave the closing argument on behalf of his respective client. The record is absolutely devoid of any showing of any conflict of interest.

The last issue raised by defendant Reidt involves the mandatory life sentence imposed for conviction of delivery of 650 grams or more of cocaine. This

issue is common to all four appeals and will be dealt with as the last issue, *infra*.

### DEFENDANT HARRINGTON

In order to analyze the issues raised by defendant Harrington on appeal it will be necessary to detail further facts from the record of the events leading to the transaction in Oakland County on May 18, 1984. The first time that Officer Myny had contact with any party besides defendant Harding was a meeting in London, Ontario, on April 30, 1984, in which he was introduced to defendant Reidt. Myny indicated in his testimony that, during that meeting, Reidt left to discuss the drug deal with a friend and later turned. When he returned, Myny saw him pull into a parking lot as a passenger in what he described as a "light brown, goldish color foreign car" with an Ontario license plate bearing the partial number "531." The discussion continued with Reidt, Harding and Myny and arrangements were finally made for the transaction to take place in Oakland County on May 18, 1984. On that day, a member of the police surveillance team stationed at the Detroit-Windsor Tunnel at approximately 3:00 in the afternoon saw a gold BMW with Ontario license plates bearing the number "NED531." That car entered the United States. The surveillance officer identified defendant Harrington as the driver of that vehicle and defendant Reidt as the passenger. The car was followed to the Holiday Inn in Troy, Michigan, and the surveillance officer observed defendant Harrington register for Room 404. Defendant Harrington registered as the driver of a Chrysler with license number PRK93. On the same day, Myny, as arranged, met defendant Harding in Warren, Michigan, and drove him to the Holiday Inn in Troy

where the two men met defendant Reidt. The deal
was discussed between the three men and defen-
dant Reidt eventually took Myny out to the motel
parking lot where Reidt showed him samples of
cocaine in his car. Reidt then left the car to talk to
"his people," something Reidt had also done in
their earlier conversations, and Myny at this time
saw Reidt talking to people in a "goldish brown,
light BMW, with Ontario Plates" bearing the num-
ber "NED531." Myny said that he saw two people
in the car. Further discussions took place which
ultimately led to Myny's arresting Reidt in a
nearby motel, the Red Roof Inn, where Myny had
been led to a motel room and given a combination
to a suitcase which contained thirteen packages of
cocaine. Defendant Harrington was seen at the
Troy Holiday Inn talking to defendant Reidt and
was also seen coming and going from Holiday Inn
Room 404 from time to time during the evening.
The surveillance team also saw the gold BMW drive
through the parking lot of the Red Roof Inn with
defendant Harrington driving. After Reidt was
arrested by Myny, defendant Harrington was ar-
rested in the motel parking lot. At the trial,
defendant Harrington moved for a directed ver-
dict. That motion was denied.

The first issue raised by defendant Harrington is
claimed error from the denial by the lower court
of his motion for a directed verdict. It is the
position of defendant Harrington that the lower
court applied the wrong standard. The standard
for ruling on a motion for a directed verdict was
reiterated by this Court in *People v Duenaz,* 148
Mich App 60, 64; 384 NW2d 79 (1985):

> When ruling on a motion for a directed verdict
> of acquittal, the trial judge must view the evidence
> presented in a light most favorable to the prosecu-

tion and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979), cert den 449 US 885 (1980).

Therefore, if the jury in the instant case could have determined from the evidence presented that the essential elements of a conspiracy to deliver cocaine and delivery of cocaine were proven beyond a reasonable doubt with respect to this defendant, then the lower court properly submitted this defendant's case to the jury.

A conspiracy is "a mutual agreement or understanding, expressed or implied, between two or more persons to commit a criminal act or to accomplish a legal act by unlawful means." *People v Carter,* 415 Mich 558, 567; 330 NW2d 314 (1982). A twofold specific intent is required for conviction: (1) the intent to combine with others, and (2) the intent to accomplish the illegal objective. *Id.* at 568. Although the essence of a conspiracy is the agreement itself, "[d]irect proof of agreement is not required, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact." *People v Atley,* 392 Mich 298, 311; 220 NW2d 465 (1974). The conspiracy may be proven by circumstantial evidence or based on inference. *Id., People v Sutherlin,* 116 Mich App 494, 498; 323 NW2d 456 (1982). *People v Taurianen,* 102 Mich App 17, 31; 300 NW2d 720 (1980).

While it is true that the court in ruling on the motion for a directed verdict made reference to the sufficiency of the evidence, it is also clear that the court did not err in denying the motion. A review of the record establishes a reasonable inference

that defendant Harrington's acts and conduct on May 18, 1984, established his participation in the conspiracy beyond a reasonable doubt. He was seen driving defendant Reidt through the Detroit-Windsor Tunnel on the day of the crime. He was observed with defendant Reidt entering and leaving a room at the Troy Holiday Inn. He was later seen at the Troy Holiday Inn while Officer Myny and Reidt were negotiating the logistics of the drug transaction. His gold BMW was seen. That same car was seen in the parking lot of the Red Roof Inn with defendant Harrington behind the wheel before and during the actual transaction which led to defendant Reidt's arrest and ultimately to defendant Harrington's arrest. When this evidence is looked at in a light most favorable to the prosecution, a reasonable inference can be drawn that defendant Harrington's acts establish that he had agreed to the conspiracy. *Atley; Sutherlin, supra.* The same evidence that connects this defendant to the conspiracy is also proof of his involvement as an aider and abettor in the delivery of cocaine. In *People v Vicuna,* 141 Mich App 486, 495; 367 NW2d 887 (1985), this Court stated:

> The phrase "aiding and abetting" describes all forms of assistance rendered to the perpetrator of the crime and comprehends all words or deeds which may support, encourage or incite the commission of a crime.

Again, facts in support of the charge of aiding and a abetting the delivery of cocaine can be found in the evidence beyond a reasonable doubt. The lower court did not err in denying defendant Harrington's motion for directed verdict with respect to either charge.

Defendant Harrington next argues that there

was not sufficient evidence to prove a delivery of cocaine or an attempted delivery of cocaine. The essence of defendant Harrington's argument is that defendant Reidt merely made preparations to deliver. This issue is without merit. There was a "delivery" of the cocaine within the meaning of the statute. "Deliver" or "delivery" is defined as "the actual, constructive, or attempted transfer from 1 person to another of a controlled substance, whether or not there is an agency relationship." MCL 333.7105(1); MSA 14.15(7105)(1).

The elements of a criminal attempt are the specific intent to commit the crime intended coupled with an overt act going beyond mere preparation towards the commission of the crime. *People v Coleman,* 350 Mich 268; 86 NW2d 281 ((1957); *People v Kimball,* 109 Mich App 273, 278-279; 311 NW2d 343 (1981), remanded on other grounds, 412 Mich 890; 313 NW2d 285 (1981). However, "it is no defense that a defendant fails to carry through to completion the crime attempted because of the intervention of outside forces, because circumstances turn out to be different than expected, or because the defendant meets more resistance than expected." *Id.* at 280.

In the instant case, there was sufficient evidence of an overt act going beyond mere preparation to deliver the cocaine. Reidt had obtained the key to the motel room in which the cocaine was kept and was given the combination of the suitcase containing the cocaine. After Reidt took Myny to the room, Reidt showed no indication of withdrawing from or abandoning the drug transaction. Therefore, the evidence presented at trial established at least an attempt to deliver the cocaine. The statute does not require an actual delivery. MCL 333.7105(1); MSA 14.15(7105)(1). We find no error.

Next, defendant Harrington raises two questions

regarding the lower court's instructions. Defendant Harrington failed to object to the jury instructions and therefore did not preserve this issue for appellate review. *People v Bragdon,* 142 Mich App 197, 200; 369 NW2d 208 (1985).

The constitutionality of the mandatory life sentence will be discussed *infra.*

### DEFENDANT DESORCY

Additional facts regarding the actions of defendant Desorcy will be outlined here to assist in the review of issues raised by him in his appeal. During the negotiations between Officer Myny and defendants Harding and Reidt at the Troy Holiday Inn, Reidt eventually took Myny to Myny's car in the parking lot where Myny was shown a sample of the cocaine. During his conversation with Myny, defendant Reidt left the car and spoke with two people, one of whom was identified as defendant Desorcy. This conversation took place in front of the Troy Holiday Inn. At one point, defendant Reidt brought defendant Desorcy to Myny's vehicle where Reidt ordered Myny to open the car's trunk to show defendant Desorcy the money for the cocaine. Reidt and defendant Desorcy then stepped away from the car to talk, out of Myny's hearing. Myny observed Desorcy give Reidt a key and a piece of paper. Reidt and Myny then drove to the Red Roof Inn. As Myny left his car he noticed a Buick Regal with a Florida license plate parked behind him. Defendant Desorcy was in the driver's seat. Myny and Reidt took the money and went to a room at the Red Roof Inn. That room was opened by the key that Desorcy had given Reidt. The piece of paper Desorcy had given Reidt showed the combination to a locked suitcase in the room which contained thirteen packages of co-

caine. It was at this time that Myny arrested
Reidt. When he left the room, he observed other
members of the surveillance team arresting defen-
dant Desorcy and his companion. At the time of
Desorcy's arrest in the Buick Regal, a police officer
searched the vehicle and found a duffel bag con-
taining several pieces of identification. In the
trunk, a Florida license plate, clothing and other
personal belongings were found. The personal be-
longings included a checkbook bearing the name
"Frank Mossop." The police took the car into
possession and did not search it again until three
days later, on May 21, 1984. An inventory check-
list was not compiled at either search. During the
trial, a desk clerk at the Red Roof Inn testified
that the registration for the room in which the
transaction took place showed the name "Frank
Mossop." The witness was unable to identify
Desorcy. At the time of Desorcy's arrest, he had a
Florida driver's license bearing his photograph and
the name "Frank Mossop." At trial, the prosecu-
tion also introduced documentation of a driver's
license bearing the name of "Francis Mossop" with
an address in London, Ontario.

Defendant Desorcy first argues that the lower
court erred in denying his motion to suppress
evidence seized during the search of the Buick
Regal at the time of his arrest. It should be noted
that the only item connected with defendant De-
sorcy that was found in the search of the vehicle
was the checkbook bearing the name of "Frank
Mossop," and that it was found in the search
immediately following the arrest. Defendant De-
sorcy admits that there may have been justifica-
tion for an inventory search at that time. We
decline this defendant's invitation to address the
lengthy constitutional argument he presents on
the validity of an inventory search or a search

incident to arrest and simply note that, even assuming, arguendo, that the lower court erred in denying the motion to suppress, the error was clearly harmless beyond a reasonable doubt. The only item involved in the search which was connected to this defendant was the checkbook. As will be outlined in the decision of this defendant's next issue, there was strong evidence connecting this defendant to the drug transaction and supporting his convictions for conspiracy to deliver and delivery of the cocaine.

The next issue involves the denial of this defendant's motion to present nontestimonial evidence of a speech impediment to the jury. Both desk employees at the Troy Holiday Inn and the Red Roof Inn testified that there was nothing unusual about this defendant's voice when he checked into either of those two motels. It is this defendant's position that he has a noticeable stutter and he wanted to take the stand to demonstrate the stutter to the jury in a nontestimonial fashion, thus avoiding substantive cross-examination. The lower court denied the motion, noting that such an offer of proof would be unreliable and easily feigned. Defendant Desorcy here seems to argue that if a defendant can be compelled to give a voice exemplar to a jury without infringing on his Fifth Amendment right then he should also be able to, in effect, offer the same thing without waiving his Fifth Amendment right. See *People v Williams,* 42 Mich App 278, 280-281; 201 NW2d 286 (1972), lv den 389 Mich 779 (1973). It should be noted that the lower court based its ruling on the lack of reliability of this defendant's offer of proof. This defendant could have easily faked the stutter while on the stand before the jury. As argued by the prosecutor and noted by the court, this defendant was not precluded from producing other wit-

nesses to testify as to his speech impediment, if
one existed. We find no error.

Defendant Desorcy moved for a directed verdict
at the time of the people's resting of their case.
The lower court denied the motion. This issue is
identical to the one presented by defendant Har-
rington. Defendant Desorcy, like Harrington, does
not deny that a conspiracy existed. He only claims
that there is no evidence that he was a member of
that conspiracy. We disagree. Defendant Desorcy's
connection to the conspiracy has been outlined in
the facts detailed *supra.* Defendant Desorcy's acts
and conduct on May 18, 1984, as indicated in the
evidence presented at trial viewed in the light
most favorable to the prosecution, established his
participation in the conspiracy beyond a reason-
able doubt. That same evidence, when viewed in
the light most favorable to the prosecution, also
supports the essential elements of the crime of
delivery of cocaine. Defendant Desorcy was seen
speaking to defendant Reidt at the Troy Holiday
Inn; he accompanied Reidt to Officer Myny's car in
order to inspect the money to be used in the
transaction; he gave defendant Reidt a key and a
piece of paper which later turned out to be the key
to the motel room at the nearby Red Roof Inn
where the transaction took place and the piece of
paper contained the combination to the suitcase
which contained the cocaine. When this evidence
is looked at in the light most favorable to the
prosecution, a reasonable inference can be drawn
that this defendant's acts established that he was
a participant in the conspiracy and an aider and
abettor to the delivery. *Atley, Sutherlin* and *Vi-
cuna, supra.*

Defendant Desorcy next argues that the general
conspiracy statute, MCL 750.157a; MSA 28.354(1),
does not require that a defendant convicted of

conspiracy to deliver more than 650 grams of cocaine be sentenced to life imprisonment. On this issue, defendant Desorcy seeks a remand for resentencing on the conspiracy conviction. Defendant relies on the case of *People v Fernandez,* 143 Mich App 388; 372 NW2d 567 (1985), lv gtd 422 Mich 978 (1985). Following oral argument in this case, the Supreme Court issued its opinion in *Fernandez* on December 29, 1986, reversing the Court of Appeals, 427 Mich 321; 398 NW2d 311 (1986). Defendant Desorcy was properly sentenced to life imprisonment for his conspiracy conviction.

Finally, all defendants argue that mandatory life in prison for a conviction of delivery of 650 grams or more of cocaine is a violation of the federal and state constitutional provisions prohibiting cruel or unusual punishment. That issue has been visited on a number of occasions by this Court and in all cases this Court has decided that the mandatory sentence is not cruel or unusual punishment. *People v Matthews, supra* at 64; *People v Ward,* 133 Mich App 344, 357; 351 NW2d 208 (1984); *People v Harman,* 124 Mich App 93, 98; 333 NW2d 591 (1983), lv den 417 Mich 1100.45 (1983); *People v Puertas,* 122 Mich App 626, 630; 332 NW2d 399 (1983), lv den 417 Mich 1056 (1983); *People v Kaigler,* 116 Mich App 567, 572-573; 323 NW2d 486 (1982); *People v Campbell,* 115 Mich App 369, 376-381; 320 NW2d 381 (1982), lv den 417 Mich 879 (1983); *People v McCarty,* 113 Mich App 464; 317 NW2d 659 (1982), lv den 414 Mich 958 (1982). We are constrained to follow the precedent on this issue. The policy arguments presented by the defendants in support of their position are persuasive. The Michigan Supreme Court has not decided this issue. We would invite a review by the highest court of the state as we would invite the Legislature to revisit this issue; however, in the

case before us the body of precedent that holds that the mandatory life sentence does not violate the federal or state constitutions precludes us from ruling otherwise.

As to defendant Harding, reversed and the defendant is ordered discharged. As to defendants Reidt, Harrington and Desorcy, affirmed.


D. E. HOLBROOK, JR., P.J. *(dissenting).* I dissent from the majority's holding that a mandatory life sentence for conviction of conspiracy to deliver over 650 grams of cocaine does not constitute cruel or unusual punishment in violation of US Const, Am VIII, or Const 1963, art 1, § 16. Instead, I adopt the thorough and persuasive dissent of Judge M. J. KELLY in *People v Harman,* 124 Mich App 93, 101-106; 333 NW2d 591 (1983), lv den 417 Mich 1100.45 (1983).